UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DAYNA JOHNSON,

Plaintiff,

-against-

POSTAL INSPECTOR DENNIS O'CONNEL;
AND "ANNA (JANE DOE)," POST
INSPECTOR,

Defendants.

---

15-CV-2288 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Dayna Johnson ("Plaintiff"), a *pro se* litigant and former Postal Service employee, brings this action against Postal Inspector Dennis O'Connell ("Defendant") in his individual capacity under *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999 (1971) which allows a cause of action for damages against federal agents who have allegedly violated the Fourth Amendment. (*See* Amended Complaint, ("Am. Compl."), ECF No. 5.) Plaintiff alleges that Defendant is liable for violating her constitutional rights in connection with investigating the armed robbery of a Postal Service facility in August 2013. (*See id.*) Plaintiff raises claims of false arrest, false imprisonment, and unlawful search and seizure, under the Fourth and Fourteenth Amendments, as well as a claim of cruel and unusual punishment, under the Eighth and Fourteenth Amendments. (*See id.* at 3.) Plaintiff seeks $10 million in punitive damages and $10 million in compensatory damages. (*Id.* at 4.)

Presently before the Court is Defendant's Motion for Summary Judgment (Motion for Summary Judgment, ("Defendant's Motion"), ECF No. 55.) For the reasons discussed below, Defendant's Motion is GRANTED.


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/17/2018

## I.    BACKGROUND

The facts are taken from the parties' Rule 56.1 statements, affidavits, declarations, and exhibits, and are not in dispute except where so noted. All rational inferences are drawn in Plaintiff's favor.

### A.    The Post Office Robbery on August 5, 2013

On August 5, 2013, a masked individual carrying a handgun robbed the United States Post Office at 335 South Broadway in Yonkers, New York. (Defs. 56.1 ¶¶ 1-2, ECF No.59; Pl. Resp. to 56.1 ¶¶ 1-2, ECF No. 51.) The parties dispute exactly what happened during the robbery. According to Defendant, the gunman assaulted a contractor and escaped with $26,000. (Def. 56.1 ¶¶ 3-4; O'Connell Decl., ECF No. 57 ¶ 2.) According to Plaintiff, "[a]fter the robber entered the United States Post Office … he directed Plaintiff and her coworkers into the Post Office's safe," where "Plaintiff was unable to see anything that the robber did in the Post Office." (Pl. Resp. to 56.1 ¶ 3.) Defendant and Plaintiff were both present and working on the day of the robbery. (Defs. 56.1 ¶¶ 5-6; Pl. Resp. to 56.1 ¶¶ 5-6.) After the robbery, Defendant was assigned to investigate and look into the incident. (Defs. 56.1 ¶ 5; Pl. Resp. to 56.1 ¶ 5.)[1]

---

[1] Plaintiff claims that she cannot confirm what Defendant claims happened during the robbery because she was not provided any of the following: "copies of PS 7532--Robbery Report; PS 2027--Burglary Report; PS 2162 --Burglary and Robbery Countermeasures Program; PS 589--Electronic Surveillance Summary Report; PS 714--Evidence/Property Report (2-part set); PS 720 Property/Evidence Log; PS 720-A--Property/Evidence Log (continuation); PS 6700--Property/Evidence Custody Document; PS 2026-B--Investigative History File - Firm Data; PS 2026-QD--Personal History Data- QD; PS 1512--Notification of Investigation (card) that may have information about what the robber did during the robbery." (Pl. Resp. to 56.1 ¶ 3.)

Defendant's counsel, however, claims that Plaintiff was voluntarily provided with all relevant discovery on three separate occasions, despite the fact that Plaintiff did not once serve Defendant with any discovery requests. *See* Supplemental Declaration of Jeannette Vargas ("Vargas Supp. Decl.") ¶¶ 3-4, ECF No. 62.) This Court noted Plaintiff's passiveness in discovery and recently issued a decision, denying Plaintiff the opportunity to reopen discovery at this stage in the litigation.  (*See* Memorandum and Order Dated 10/10/2018, ECF No. 65.)

**B. The Interview on June 11, 2014**

On June 11, 2014, about ten months after the robbery, two postal inspectors, Maliako and Escoto, approached Plaintiff at work and took her to a conference room at the Postal Service's mail processing and distribution center. (Defs. 56.1 ¶¶ 7-9; Pl. Resp. to 56.1 ¶¶ 7-9.) They then questioned Plaintiff about the robbery. (Defs. 56.1 ¶ 10; Pl. Resp. to 56.1 ¶ 10.) Before the questioning, Plaintiff signed a document reflecting that she was voluntarily waiving her Miranda Rights. (Defs. 56.1 ¶ 11; Pl. Resp. to 56.1 ¶ 11; Declaration of Jeanette Vargas, ("Vargas Decl."), Ex. B. ECF No. 58.) Before signing this document, Plaintiff claims that Maliako and Escoto never told her that "there would be no negative repercussions if she told them to leave her alone[,]" and that she was told that signing the document would "make her feel comfortable." (Pl. Resp. to 56.1 ¶ 11). The waiver also reflected that she was "willing to discuss subjects presented and answer questions," and that "no promises or threats have been made to me and no pressure or coercion of any kind has been used against me." (Defs. 56.1 ¶ 11; Vargas Decl., Ex. B, ("Miranda Waiver."))

The parties dispute Defendant's role during the interview. Defendant claims that he was near the conference room where the interview took place, but did not enter the room during the interview, observe the interview, or otherwise participate in it; rather he just received periodic updates. (Defs. 56.1 ¶¶ 13-14). According to Plaintiff, Defendant travelled to the interview after his "individual interrogation" was unsuccessful, positioned himself near the interview room, "solicited" updates about the interview, and provided advice to those involved in the interview via email. (Pl. Resp. to 56.1 ¶¶ 13-14.) Plaintiff also claims that Defendant twice observed Escoto escort Plaintiff to the bathroom. (*Id*.)

The parties also dispute what happened in the interview room. Defendant claims that he "heard no yelling nor observed anything that would indicate there was anything unlawful about

the interview." (Defs. 56.1 ¶ 16.) He adds that during the interview, Plaintiff admitted that, prior to the robbery, an individual identified as CA-2, approached her with questions about the Yonkers Post Office's security cameras, the times when there would be a lot of money at the facility, when the trucks arrived, and how many people were present at different times. (*Id.* ¶ 17.) Plaintiff supposedly also told the interviewers that she understood that CA-2 was asking these questions because he was considering robbing the Post Office, and that she "asked him not to do it." (*Id.* ¶ 18.) Plaintiff supposedly further revealed that a few months after CA-2 first asked her about the Post Office, he again approached her with the same questions, at which point she answered that it would be better to go inside the facility to commit the robbery. (Defs. 56.1 ¶¶ 19-20.) She allegedly told the inspectors that she again asked CA-2 not to commit the robbery but that if he did go through with it, "not to go inside" the facility because Plaintiff "didn't want her co-workers to get hurt." (Pl. Resp. to 56.1 ¶ 21). Instead, she advised CA-2 to commit the robbery "on the loading dock" of the facility. (*Id.* ¶ 22.)[2]

Plaintiff does not dispute Defendant's account of the questions asked or the answers she gave; rather, Plaintiff claims that other "elements of the interrogation were unlawful." (*Id.* ¶ 16.) For example, she claims that during the interrogations, she was forced to leave her cell phone at the table and could not answer the calls she was getting. (*Id.*) She claims she was allowed to go to the bathroom only twice over seven hours, and that when she left to go to the bathroom, she was forced to leave her phone in the room and was followed by Escoto both times, even though she asked Escoto not to accompany her. (*Id.*)[3] She also claims that she was prohibited from eating or

---

[2] Plaintiff admitted these facts in the written statement that she composed at the end of her interview. (*See* Plaintiff's Declaration in Opposition, ("Pl. Decl. Opp."), ECF No. 52, Ex. O.)

[3] Plaintiff concedes that the single-use bathroom had a stall to conceal the toilet from the sink area. (Pl. Resp. to 56.1 ¶ 16.) She also claims that Defendant saw Escoto follow her to the bathroom both times. (*Id.*)

drinking during the questioning and that when the interview ended, she was "forced to write a statement" that Defendant made her modify multiple times because it was "too weak." (*Id.*)

## C. The Arrest on June 16, 2014

On June 16, 2014, five days after Plaintiff was first interviewed in connection with the August 5th robbery, Defendant learned that Plaintiff left her job with the Postal Service. (Defs. 56.1 ¶ 23; Pl. Resp. to 56.1 ¶ 23.) Defendant claims that, at this point, because the AUSA investigating the robbery was concerned that Plaintiff could pose a flight risk, he instructed Defendant to arrest her immediately. (Defs. 56.1 ¶ 24.) Thereafter, Inspectors and a uniformed local police officer went to Plaintiff's apartment and placed her under arrest. (*Id.* ¶ 25.) During the arrest, they directed Plaintiff to sit in a chair in the middle of her living room while the arresting team members conducted a protective sweep of the apartment to ensure that no other individuals were present. (*Id.* ¶ 26.) Defendant claims that this protective sweep lasted less than a minute and occurred because the arrest team had safety concerns regarding Plaintiff's apartment, since the CA-2 had used a handgun and had assaulted a Postal Service employee and because Plaintiff's boyfriend, CA-1, who was also being investigated for his involvement in the robbery, often stayed at the apartment. (*Id.* ¶¶ 28-30.) The arrest team also searched Plaintiff's closets in the living room and bedrooms. (*Id.*) Finally, Defendant claims that he requested consent to search Plaintiff's cellphone, which she refused, and consequently, he confiscated it as a potential source of evidence and because "prisoners are not allowed to maintain possession of a cellphone while in a holding cell." (*Id.* ¶¶ 31-33.)

Plaintiff paints a different picture of how the search and arrest on June 16 occurred. She claims that Defendant and a uniformed police officer arrived at her apartment at 3:30 pm on June 16, 2014, and when she opened the door, they "demand[ed] entry" and "barged in" without her

permission or a warrant. (Pl. Resp. to 56.1 ¶¶ 25-26.) She also claims that she has not received any notes about Defendant's placement at her door during this search or about who the supervising law enforcement officer was, let alone about her supposed consent. (*Id*.) She also states that Defendant never claims that he observed or heard Plaintiff consent to inspectors entering and searching her home. (*Id*.) As to the "protective sweep," Plaintiff claims that the total search of her apartment lasted for approximately 10 to 15 minutes and that she was required to change into "more appropriate clothing," which she had to do in front of Escoto. (*Id*. ¶¶ 28-29.) Plaintiff also asserts that the request to search and confiscation of her cell phone happened prior to her "booking." (*Id*. ¶¶ 31-33.)

Plaintiff further adds that after being arrested, she was confined overnight and then brought to the courthouse, where she was told she "would have to give up [her] retirement money." (Am. Compl., Pl. Aff. ¶ J.) To be released, she then signed a bail package, which imposed numerous restrictions on her such as house arrest, restricted travel, supervision, and drug testing. (*Id*. ¶ K.) She claims that due to these conditions, she could not go outside, lost weight, and suffered from anxiety, depression, and mental anguish. (*Id*.) Specifically, she claims that she had only 2 hours of sunlight per week, was smoking two packs of cigarettes per day, lost 14 pounds in 41 days, "could not eat nor hardly sleep," and her nerves were shattered. (*Id*. ¶ L.) Plaintiff claims she was also "told not to have people in [her] apartment." (*Id*.)

Although the charges against her were dismissed on August 6, 2014, Plaintiff claims that there are still charges on file, which have prevented her from getting a new job and have forced her to use her retirement money to survive. (*Id*. ¶ M.) In her deposition, however, Plaintiff contradicts herself and admits that she has been able to resolve issues related to her record and attain gainful employment. (*See* Declaration of Jeannette Vargas, Ex. A, Pl. Dep. Tr. 210:4-20.).

## II.   STANDARDS OF REVIEW

### A.  Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," *see* Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).  If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013) (summary order).  Courts must "draw all rational inferences in the non-movant's favor," while reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Importantly, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for

a trial." *Anderson*, 477 U.S. at 250. Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

Critically, in an opposition to a motion for summary judgment "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998))).

When dealing with summary judgment motions in *pro se* cases, courts in this Circuit must "read the pleadings of a *pro se* plaintiff liberally and "raise the strongest arguments that they suggest" *McPherson v. Coombe*, 17 F.3d 276 (2d Cir. 1999) (*quoting Burgos v. Hopkins*, 214F.3d.787, 790 (2d. Cir. 1994). Pleadings drafted by *pro se* plaintiffs moving for summary judgment are not held to the same "stringent standards" as "formal pleadings drafted by lawyers." *Shariff v. Poole*, 689 F.Supp.2d 470, 476 (S.D.N.Y. January 20, 2010). On the other hand, *pro se* plaintiffs cannot overcome a motion for summary judgment by simply making "bald" assertions that are unsupported by the evidence. (*Id.*)

## B. Federal Claims Brought Pursuant To *Bivens v. Six Unknown Agents*

Under *Bivens* and its progeny, federal courts can hear suits for money damages against federal government officials accused of violating constitutional rights. *Bivens* 403 U.S. 388, 396–97, 91 S.Ct. 1999, 2004–05; *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66, 122 S.Ct. 515, 519 (2001) ("In *Bivens* ... we recognized for the first time an implied private action for

damages against federal officers alleged to have violated a citizen's constitutional rights."); *Schweiker v. Chilicky*, 487 U.S. 412, 421, 108 S.Ct. 2460, 2466 (1988) ("In [*Bivens*], this Court held that the victim of a Fourth Amendment violation by federal officers acting under color of their authority may bring suit for money damages against the officers in federal court."); *Carlson v. Green*, 446 U.S. 14, 18–19, 100 S.Ct. 1468, 1471 (1980) ("*Bivens* established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right.").

" '*Bivens* actions are not significantly dissimilar to claims brought under [42 U.S.C.] §§ 1981 and 1983 in terms of the interests being protected, the relief which may be granted and the defenses which may be asserted.' " *Chin v. Bowen*, 833 F.2d 21, 23–24 (2d Cir.1987). "Because the two actions share the same 'practicalities of litigation,' federal courts have typically incorporated § 1983 law into *Bivens* actions." *Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir.1995) (citation omitted). Like § 1983 claims, *Bivens* actions preclude vicarious liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S. Ct. 1937, 1948, 173 L. Ed. 2d 868 (2009) ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.") Hence, to prevail on a *Bivens* claim, a plaintiff must plead that there was a violation of a clearly established constitutional right and that a defendant was personally involved in the alleged wrong.

Further, while *Bivens* allows a private right of action under the Fourth Amendment, the Supreme Court has extended *Bivens* to the Fifth Amendment's Due Process Clause and the Eighth Amendment's Cruel and Unusual Punishment Clause. *See Davis v. Passman*, 442 U.S. 228, 99 S. Ct. 2264, 60 L. Ed. 2d 846 (1979) (extending *Bivens* to the Fifth Amendment); *Carlson v. Green*, 446 U.S. 14, 100 S. Ct. 1468, 64 L. Ed. 2d 15 (1980) (extending *Bivens* to the Eight Amendment).

Beyond those amendments, the Supreme Court has instructed courts to take a "cautious" approach and not accept *Bivens* claims in new contexts. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 198 L. Ed. 2d 290 (2017) ("expanding the *Bivens* remedy is now considered a "disfavored" judicial activity.").

## III.  DISCUSSION

The Court begins by noting that while Plaintiff brings her Fourth Amendment Claims simultaneously under the Fourth Amendment and Fourteenth Amendment, (Pl. Aff. § III. C), and her Eighth Amendment claims simultaneously under the Eight Amendment and Fourteenth Amendment, (*id.*), the Fourteenth Amendment is not implicated in a *Bivens* action because it pertains to state conduct.[4] Accordingly, Plaintiff's Fourteenth Amendment claims are summarily dismissed from this action, as the Defendant is employed by a federal, not state, agency and Defendant's conduct is properly assessed under the Fourth and Eight Amendments in this suit. The Court now assesses each of Plaintiff's claims with a Fourth or Eight Amendment nucleus.

Liberally construing the pleadings, Plaintiff claims that her Fourth Amendment rights were violated when: 1) Defendant unlawfully imprisoned her during the June 11, 2014 interrogation, (Am. Compl. Pl. Aff. ¶ C), 2) Defendant and inspectors, without a warrant or any probable cause, searched her home and person and then arrested her on June 16, 2014 (*Id.* ¶¶ I, G, H), and 3) Defendant unlawfully detained her subsequent to the arrest (*Id.* ¶¶ J, K, L, M.) Plaintiff also claims that her Eight Amendment rights were violated during her June 11, 2014 interview when she was: questioned for seven hours, not allowed to use the bathroom alone, not allowed to eat or drink, and not allowed to answer her cellular telephone. (Pl. Aff. § III. C.; ECF No. 5.)

---

[4] The Fourteenth Amendment prohibits a state from denying any person due process of law and the Equal Protection of the law. (*See* U.S. Const. amend IV.) ("No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.")

Defendant argues that he is entitled to summary judgment on two grounds. First, he contends that he was not personally involved in the conduct that led to the alleged wrongs, did not supervise the conduct, and nevertheless is entitled to qualified immunity. (Defendant's Memorandum of Law ("Def. Mem."), ECF No. 56 at 7-15; Defendant's Reply Memorandum of Law ("Def. Rep."), ECF No. 61 at 1-5.) Second, he argues that Plaintiff has failed to provide sufficient evidence from which a fair-minded jury could find a constitutional violation. (Def. Mem. at 7-10, 15-16; Def. Rep. at 5-10.)

The Court agrees with the Defendant, but it first addresses each constitutional claim on the merits and based on the sufficiency of the proffered evidence. It then assesses Defendant's personal involvement and potential qualified immunity.

### A. Fourth Amendment Claims

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend IV. Because the touchstone of the Fourth Amendment is reasonableness, *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516 (1967), the Amendment proscribes only those government-initiated searches and seizures that are unreasonable. *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793 (1990).

### 1. False Imprisonment During the June 11 Interview

False imprisonment is a cause of action that generally arises under state tort law. In New York, a plaintiff seeking to establish a cause of action for false imprisonment or false arrest must show that: (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged, such as by probable cause or a warrant. *Willey v. Kirkpatrick*, 801 F.3d 51, 70-71 (2d Cir. 2015) (quoting *Broughton v. State of New York*, 335 N.E.2d 310, 314 (N.Y. 1975)).

Although certain courts have declined to adjudicate false imprisonment claims under *Bivens* altogether, *see e.g.*, *Holland v. Pinkerton Sec.*, 68 F. Supp. 2d 282, 284 (S.D.N.Y. 1999), this Court finds that because "claims of false arrest and false imprisonment are premised on a lack of probable cause,… *Bivens* claims of false arrest and false imprisonment implicate the Fourth Amendment right to be free from unreasonable seizures…" *Lewis v. Weiss*, No. 12-CV-07242 (ALC), 2016 WL 1718251, at *5 (S.D.N.Y. Apr. 27, 2016) (citing *Williams v. Young*, 769 F. Supp. 2d 594, 602 (S.D.N.Y. 2011) (internal citations and quotation marks omitted).

Here, the evidence on the record fails to support Plaintiff's claim for false imprisonment. Beginning with defendant's intent to confine Plaintiff and supposed lack of consent, Plaintiff's own exhibits demonstrate the opposite. For example, before the interrogation on June 11, 2014, Plaintiff signed a warning and waiver of her Miranda rights, containing the statement:

> I am willing to discuss subjects presented and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

(Pl. Decl. Opp., Ex. N.) Further, in her deposition, when asked "you reviewed this document and you signed it right?" she answered: "yes." (Vargas Decl., Ex. A, Pl. Dep. Tr. 57:17-19.).When again asked "you read through these words before you signed it right?" she again answered: "Yes" (*Id*. 57:20-22.) And when asked "was the statement otherwise read to you?" she again answered "Yes." (*Id*. 57:23-25). She also voluntarily composed a 3-page written statement, relaying what she knew about the perpetrators of the robbery. (*Id*., Ex O). This document stated:

> I wish to make the following statement of my own free will and accord, without coercion, threat, or promise of reward. This statement is a voluntary act on my part, prompted by my desire to assist the United States Postal Inspection Service and to tell facts without reward or special considerations.

Hence, her position that she did not voluntarily consent to the interrogation and was falsely imprisoned is unfounded. Further, Plaintiff's assertion to the contrary, in light of the documentary evidence, is self-serving.

With regards to Plaintiff's consciousness of the confinement, Defendant testified that the Inspector "informed [Plaintiff] that she was not under arrest, that she was free to leave at any time, and that she was not required to consent for an interview." (*Id.*, Ex C ¶ 11.) Plaintiff's testimony corroborates that she imposed the confinement on herself. For example, when asked: "Did you request Jane Doe not to accompany you to the bathroom?", Plaintiff responded: "I don't think I said anything." (Vargas Decl., Ex. A, Pl. Dep. Tr. 101:7-13). And when asked: "you didn't protest; is that right?" (*Id.* 101:18-19), Plaintiff replied: "No, No I didn't." (*Id.*at 101:20).

Even putting Plaintiff's consciousness of confinement aside, the evidence reflects that there was probable cause for the confinement and questioning. Prior to selecting Plaintiff for questioning, Defendant reviewed surveillance footage and cellular cite data, which showed that the two individuals believed to be the perpetrators of the robbery (one of whom was Plaintiff's boyfriend), exchanged numerous calls on the afternoon before the robbery, on the day of the robbery, and called Plaintiff. (Pl. Decl.  Opp., Ex C, ¶ 9.)

In sum, the evidence is far from sufficient to make out a claim for false imprisonment based on the collective conduct that occurred during the June 11, 2014 interview.

### 2.  Warrantless Search, Seizures, and Arrest on June 16, 2014

Under the Fourth Amendment, searches of the home that are incident to an arrest and executed pursuant to a warrant are presumptively reasonable because they are supported by probable cause. *Illinois*, 497 U.S. at 179-85. Conversely, searches and seizures that occur in the home without a warrant are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586,

100 S. Ct. 1371, 1380, 63 L. Ed. 2d 639 (1980). The Supreme Court has long-approved of consensual searches because it is reasonable for police to conduct a search with permission. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043 (1973).

For warrantless searches, the standard for assessing a suspect's consent is that of "objective" reasonableness. *Illinois*, 497 U.S. at 188, (citing *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880 (1968)). Hence, the Court asks: under the circumstances, what would the typical reasonable person have understood by the exchange between the officer and the suspect? *Id*. at 183-189. ("As with other factual determinations bearing upon search and seizure, determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?")

Similar to warrantless searches, the Fourth Amendment permits warrantless arrests when "the arresting officer has probable cause to believe a crime has been or is being committed" *United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008). In assessing a warrantless arrest, the Court considers "totality of the circumstances, from the perspective of a reasonable police officer in light of his training and experience, based on the facts known to the arresting officer at the time of the arrest." *Burgess*, 725 F. App'x at 39) (internal citations and quotation marks omitted). Probable cause to arrest exists when the officer has knowledge or reasonably trustworthy information of facts and circumstances that would be sufficient to warrant a person of reasonable caution to believe that person being arrested committed a crime. *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006).

As to protective sweeps under the Fourth Amendment, the Supreme Court has explained that when a person is arrested inside the home, similar to the "search incident to an arrest"

exception to the warrant requirement,[5] officers are permitted "as a precautionary matter and without probable cause or reasonable suspicion, [to] look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Maryland v. Buie*, 494 U.S. 325, 334, 110 S.Ct. 1093 (1990). "This exception to the warrant requirement reflects the officers' need to ensure that an arrestee not have access to a weapon or to destructible evidence." *United States v. Barone*, 721 F. Supp. 2d 261, 270 (S.D.N.Y. 2010) (citing *States v. Perea*, 986 F.2d 633, 643 (2d Cir.1993)). The concern, however, is absent where the area to be searched is not within the arrestee's reasonably immediate reach, or "grab area." *United States v. Blue*, 78 F.3d 56, 60 (2d Cir.1996).

With regards to strip searches and the Fourth Amendment, Defendants correctly note that the mere "process of exchanging clothing for prison clothing does not constitute a strip search..." (Def. Mem. at 9.) (citing *Kelsey v. County of Schoharie*, 567 F.3d 54, 65 (2d Cir.2009). Thus, even though a strip search is a term "used generally to describe any inspection of the naked body," *Campbell v. City of New York*, No. 06 CV 5743 (HB), 2010 WL 2720589, at *7 (S.D.N.Y. June 30, 2010) (citing *Kelsey*, 567 F.3d at 62; *N.G. v. Connecticut*, 382 F.3d 225, 228 n. 4 (2d Cir.2003)), the Supreme Court advocates a "test of reasonableness" to assess the propriety of a strip search, which balances "the need for the particular search against the invasion of personal rights that the search entails." *See Bell v. Wolfish*, 441 U.S. 520, 558–59, 99 S.Ct. 1861 (1979); *Murcia v. County of Orange*, 226 F.Supp.2d 489, 498 (S.D.N.Y.2002). "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for

---

[5] This exception provides that "[w]hen an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape." *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034 (1969).

initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559; *Moore v. Hearle*, 639 F.Supp.2d 352, 357 (S.D.N.Y.2009).

### i. Warrantless Arrest

The Court begins by assessing the warrantless entrance into Plaintiff's home. Although Defendant contends that the search was "authorized," (O'Connell Decl. ¶ 7), there is no arrest warrant in the record. Accordingly, the Court considers the arrest warrantless. There is, however, ample evidence on the record showing that there was probable cause and consent for the search of Plaintiff's home.

Beginning with probable cause, first, the Court notes that Plaintiff's initial interview about the robbery was conducted due to her cell phone communications with the suspected perpetrators, one of whom was her boyfriend, and a review of surveillance footage. (Pl. Decl. Opp., Ex C, ¶¶ 4, 7, 9.). Second, on June 13, 2014, just two days after Plaintiff resigned from her job with the Postal Service, AUSA Scott Hartman, who was investigating the robbery, told Defendant that Plaintiff could be a flight risk. (Pl. Decl. Opp., Ex J.) Third, in Plaintiff's written statement from her initial interview, she admitted that she had a party at her home, where a man named "boobie" kept asking her "questions about the post office," such as "if there were cameras" and when it closed. (Pl. Decl. Opp., Ex O.) Plaintiff even reported that there was a second occasion when "Boobie" and a "Bruce" asked her the "same questions" regarding where the cameras were located and when it closed. (*Id.*) Even though Plaintiff claims that she advised against committing the robbery, her admission of having knowledge of a proposed robbery, the temporal proximity of her conversation about the security at the facility, her failure to inform others about her knowledge, the connection she had to the suspects, and the timing of her resignation are collectively sufficient probable cause.

Turning to consent, Defendant argues that "there was consent, and thus no Fourth Amendment violation occurred." (Def. Rep. at 5.) Indeed, Plaintiff testified that when Defendant and inspectors came to her home, she "opened the door to let them in." (Vargas Decl., Ex. A, Pl. Dep. Tr. 111:24.) When asked: "And then you opened the door to let them in and they came in; is that right?" she answered "Yes" (*Id*. 111:25 – 112:2). And when asked: "So you didn't tell them that you did not want them to come in?" she just answered "I didn't know I had the right to do that." (*Id*. 112:3-14).

The Court finds that absent any indication that Plaintiff was resisting Defendant and inspector's request to enter her home, it was objectively reasonable for them to infer her consent. *See United States v. Grant*, 375 F. App'x 79, 80 (2d Cir. 2010) ("[I]t is well settled that consent may be inferred from an individual's words, gestures, or conduct. Thus a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'") (quoting *United States v. Buettner-Janusch,* 646 F.2d 759, 764 (2d Cir.1981)).

### ii. Protective Sweep

Turning to the protective sweep of Plaintiff's home, Defendant claims that "[t]here were safety concerns when entering the apartment because CA-2 had used a handgun and had assaulted a Postal Service employee during the robbery, as well as the involvement of [Plaintiff's] boyfriend, CA-1, who had several cellphone calls with CA-2 immediately before the Robbery." (O'Connell Decl. ¶ 9.) Defendant adds:

> Team members conducted a protective sweep of the apartment to ensure that no other individuals were present. I estimate that this search lasted less than a minute. I had no reason to believe that there was anything unusual about the scope or length of the protective sweep being performed. The only sounds I recall hearing during the protective sweet were created by opening and closing of doors. I observed no search of the apartment occurring after the protective sweep concluded.

(*Id.*) Defendant's testimony is largely undisputed, other than by Plaintiff's affidavit, which is self-serving testimony for which there is no corroborating evidence. *See Fincher v. Depository Trust & Clearing Corp.,* No. 06 Cv. 9959(WHP), 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008) *aff'd*, 604 F.3d 712 (2d Cir.2010) ("[a nonmoving party's] self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment.").

At best, one can infer that Plaintiff disputes Defendant's account of the sweep from her deposition. But in her deposition, although Plaintiff repeatedly claims that the officers "went through her stuff" (Vargas Decl., Ex. A, Pl. Dep. Tr. 123:13, 130: 8-25, 134-137), nowhere does she state that she could see the extent of the supposed searches in her closets and bedroom or even tell how long the overall search lasted. (*See e.g. id.)* ("Q: Because you were sitting here in the chair in Exhibit 12, you don't know how long Closet A was looked at? A: No; Q: And you don't know how long anyone was in bedroom one? A: No.; Q: And you don't know how long anyone was in bedroom two? A: No.; Q: And you don't know how long anyone was in the bathroom? A: No.")  Instead, Plaintiff indicated that she assumed law enforcement was going through her stuff: "They just walking around my house. You're not going to go back in somebody's house and not go through their stuff if you're law enforcement. That just don't make sense." (*Id.* 134:16-10.) With just these statements, Plaintiff fails to create a genuine dispute over exactly what happened during the protective sweep. Her vague and conclusory assertions are simply insufficient to overcome summary judgment. *See Shariff*, 689 F.Supp.2d at 476 ("a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a 'metaphysical doubt' concerning the facts…. Rather evidentiary proof in admissible form is required.")

Accordingly, the Court cannot find that an unlawful protective sweep took place.

### iii. Strip Search

The Court turns to Plaintiff's strip search claim. Here, Plaintiff's evidence is as sparse as it is with her other Fourth Amendment claims. Plaintiff claims that she was originally wearing "a dress" and was later told that she needed to change. (Vargas Decl., Ex. A, Pl. Dep. Tr. 148.) Plaintiff testified that she was then accompanied by a female officer named Anna to her bedroom, after which Plaintiff put on jeans and a shirt. (*Id*. Tr. 139.)

Defendant does not dispute these characterizations of how Plaintiff changed. Rather, Defendant argues that this does not qualify as a strip search as a matter of law. (*See* Def. Mem. at 9.) ("the process of exchanging clothing for prison clothing does not constitute a strip search where the individual was not asked to manipulate his body in a particular way.")

The Court agrees with the Defendant. Plaintiff proffers no admissible evidence revealing anything egregious about the way that Plaintiff was required to change, such as allegations of a visual body-cavity search, inspection of Plaintiff's genitalia, or touching and probing of Plaintiff's bodily cavities. *See Bell v. Wolfish*, 441 U.S. 521; *Harris v. Miller*, 818 F.3d 49, 58 (2d Cir. 2016). Consequently, the Court finds that there is simply no basis to conclude that Plaintiff was subject to any conduct akin to an unconstitutional strip search.

Accordingly, the Court finds that there is insufficient evidence to create a factual dispute surrounding any of Plaintiff's Fourth Amendment violations stemming from the June 16th arrest.

### iv. Post-Arrest False Imprisonment

Plaintiff claims that after she was arrested on June 16th, she was "deprived of a phone call to [her] family," required to give up her cell phone "against her will," fingerprinted, photographed, "confined for hours, until the next morning," and then confined to her home for 41 days with only "2 hours of sunlight a week" and no permission to have people in her apartment as

part of her conditions for release on bail. (Am. Compl. ¶¶ I-M.) Subsequently, the case was dismissed against her, but she claims "there are charges still on file." (*Id.*)

Under the Fourth Amendment, when law enforcement lacks probable cause to make an arrest, the arrest can be deemed a seizure and an individual can make a false imprisonment claim based on the detention pursuant to the arrest. In the absence of a formal arrest, a seizure under the Fourth Amendment occurs where a "reasonable person would have believed that he was not free to leave." *INS v. Delgado*, 466 U.S. 210, 215 (1984) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "False arrest is simply an unlawful detention or confinement brought about by means of an arrest rather than in some other way and is in all respects synonymous with false imprisonment." *Covington v. City of New York*, 171 F.3d 117, 125 (2d Cir. 1999) (Glasser, J., dissenting); *see also Weyant*, 101 F.3d at 853 (describing false arrest as "a species of false imprisonment"). But where a party is subject to a lawful arrest, a party cannot make out a claim for false imprisonment. *See Burgess v. DeJoseph*, 725 F. App'x 36, 39 (2d Cir. 2018) ("Probable cause is a complete defense to an action for false arrest").

The Court has already found that Plaintiff failed to produce sufficient evidence to show that the June 16th arrest was unlawful. (*See supra* Part III.A.1.ii). Consequently, Plaintiff's concomitant claims that her cell phone confiscation, overnight detention, and subsequent bond conditions were unlawful fail as a matter of law, as each action is lawful when performed in the context of a valid arrest. *See United States v. Schaefer*, 859 F. Supp. 2d 397 (E.D.N.Y. 2012), *aff'd*, 519 F. App'x 71 (2d Cir. 2013) ("There is no absolute constitutional right to a telephone call during police questioning, even after an arrest"); *Ross v. Miller*, No. 14-CV-3098 (RA)(JLC), 2016 WL 1376611, at *15 (S.D.N.Y. Apr. 7, 2016) (same); *Chimel v. California*, 395 U.S. 752, ("it is entirely reasonable for the arresting officer to search for and seize any evidence on the

arrestee's person in order to prevent its concealment or destruction"); *Preston v. United States*, 376 U.S. 364, 367, 84 S. Ct. 881, 883, 11 L. Ed. 2d 777 (1964) (This right to search and seize without a search warrant extends to things under the accused's immediate control, … and, to an extent depending on the circumstances of the case, to the place where he is arrested) (internal citation omitted); *United States v. Salerno*, 481 U.S. 739, 739, 107 S. Ct. 2095, 2097, 95 L. Ed. 2d 697 (1987) (rejecting argument that bail packages violate due process rights or constitute impermissible punishment before trial and explaining that the Bail Reform Act requires courts to detain or restrict arrestees who have been charged with serious felonies prior to trial.)

### B.  Eighth Amendment Claim

Plaintiff claims that she was subject to cruel and unusual punishment, in violation of her Eighth Amendment rights, during the interview that took place on June 11, 2014. (Am. Compl. § III.C.) She specifically claims that, during that interview she was: questioned for seven hours, not allowed to use the bathroom alone, not allowed to eat or drink, and not allowed to answer her cellular telephone. (Pl. Aff. § III. C.) (the "deprivation of food and water is in violation of my 8th Amendment Right.") Arguably, Plaintiff claims that the entire ordeal to which she was subjected in relation to investigating the Post Office robbery was cruel and unusual punishment in violation of the Eighth Amendment. (*See* Am. Compl. § III.C.).

Defendant again moves for summary judgment on two grounds. On the merits, he argues that there is no constitutional violation. (*See* Def. Rep. at 4) ("there is no caselaw even suggesting that escorting someone to a public restroom in a federal building violated their constitutional rights.") Second, Defendant argues that he had no personal involvement in the interview, no way to know or believe that Plaintiff's constitutional rights had been violated, and no duty to

intervene. (Def. Mem. at 9.) Hence, he argues that he is not liable under vicarious or supervisory liability, and he is also protected by qualified immunity. (*See* Def. Rep.)

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend VIII. Therefore, the Eighth Amendment "guarantees individuals the right not to be subjected to excessive sanctions." *Miller v. Alabama*, 567 U.S. 460, 469, 132 S. Ct. 2455, 2463, 183 L. Ed. 2d 407 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 560, 125 S. Ct. 1183, 1189, 161 L. Ed. 2d 1 (2005). The right emanates from the basic precept of justice that punishment for crime should be graduated and proportioned to [the] offense. *Roper*, 543 U.S. at 560 (citations and internal quotations omitted). "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Id.*

The Court finds that regardless of whether Plaintiff's claim is that her Eighth Amendment rights were violated during the interview on June 11, 2014 or by the collective conduct to which she was subjected over the course of the entire robbery investigation, she has provided woefully insufficient facts to support claims of an Eight Amendment violation. First, despite Plaintiff's contention that she suffered a constitutional violation because she was deprived of food and water during the seven hours when she was interviewed, the evidence reflects that Defendant told Inspectors "I have a water if she wants," and that Plaintiff indicated that she did not want any. (*See* Pl. Decl. Opp., Ex G.) Similarly, the Court has already discussed how Plaintiff was not confined during the interview on June 11, 2014. Rather, she voluntarily agreed to answer questions, provide a written statement, and accept an escort to the bathroom. (*See supra* Part III.A.1.).

Even if Plaintiff's allegations were uncontested, and even if her complaint extended to all the conduct that occurred during the course of the investigation, Plaintiff could not make out an

Eight Amendment violation on her allegations as a matter of law because the Amendment prohibits imposing unduly harsh penalties that infringe the very dignity of one's humanity. *See e.g.*, *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183 (2005) (holding the execution of individuals who were under the age of 18 at the time they committed the crimes was "cruel and unusual"); *Hogan v. Fischer*, 738 F.3d 509 (2d Cir. 2013) (finding that the alleged spraying of a prisoner with a mixture of vinegar, feces, and machine oil was "undoubtedly a form of cruel and unusual punishment . . . ."); *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) (finding that severe or repetitive sexual abuse of an inmate was an Eight Amendment violation). *Cf. Harmelin v. Michigan*, 501 U.S. 957, 111 S. Ct. 2680 (1991) (holding that the mandatory sentence of life without the possibility of parole, without any consideration of mitigating factors, did not constitute cruel and unusual punishment); *Whitley v. Albers*, 475 U.S. 312, 326, 106 S. Ct. 1078, (1986) (holding that the shooting of prisoner, without prior verbal warning, while quelling a riot was not cruel and unusual punishment).

In sum, an Eight Amendment violation is not triggered by the innate discomforts of arrest. Accordingly, the Court finds no constitutional violation under the Eight Amendment.

### C. Personal Involvement, Qualified Immunity and Supervisory Liability

Because Plaintiff has not sufficiently shown a single constitutional violation, she has not satisfied the first requirement for making out a *Bivens* claim. *Ashcroft v. Iqbal*, 556 U.S. 662. Consequently, the Court need not even address the arguments on Defendant's personal involvement, qualified immunity, or supervisory liability. But because the parties have briefed these issues, the Court briefly addresses them.

## 1. Personal Involvement

Because Bivens actions, like § 1983 actions do not permit vicarious liability, "a plaintiff must plead that each Government-official defendant, through the official's own actions, has violated the Constitution." *Id*. Here, notwithstanding that the Court finds insufficient evidence that any constitutional violation occurred during the June 11, 2014 interview, Defendant argues that even if any violations occurred, there is no evidence indicating that he was personally involved or that it was objectively reasonable for him to know or believe that his actions were unlawful at the time. Defendant's declaration states:

> I did not participate in the interview. Although I remained near the conference room where the interview was occurring, I did not enter the conference room. The Inspectors interviewing Johnson would periodically give me updates on the information Johnson was providing. The Inspectors informed by email that Johnson had been read her Miranda rights and had signed a waiver of those rights. I emailed Inspectors conducting the interview and offered to provide a bottle of water to Johnson, but was informed that she didn't want any. I observed Johnson getting breaks during the interview to use the restroom. I heard no yelling coming from the conference room. I observed nothing unusual about the manner in which the interview was being conducted and did not observe anything that would cause me to believe that the manner in which the interview as being conducted was not unlawful.

(O'Connell Decl. ¶ 6.) Defendant's declaration is uncontested because Plaintiff never requested to depose Defendant or otherwise partake in discovery. (*See* Vargas Supp. Decl. ¶¶ 3-4; Memorandum and Order Dated 10/10/2018, ECF No. 65.) Moreover, other evidence on the record, such as Plaintiff's own exhibits demonstrating the email exchange between Defendant and inspectors, corroborates Defendant's testimony. (*See* Pl. Decl. Opp., Ex G.) (indicating that Defendant offered Plaintiff water, which she did not want).

Thus, it is undisputed that Defendant was not personally involved in questioning Plaintiff and did not observe any conduct that he subjectively believed was unlawful. And while Plaintiff

contends that Defendant positioned himself near the interview room, "solicited" updates about the interview, provided advice to those involved in the interview via email, and observed Escoto escort Plaintiff to the bathroom, (Pl. Resp. to 56.1 ¶¶ 13-14), Plaintiff's affidavit is again self-serving testimony for which there is simply no corroborating evidence. *Fincher*, 2008 WL 4308126, at *3.

As for Plaintiff's theory that Defendant is liable based on his failure to intervene, (Pl. Decl. Opp. at 6-7), Defendant argues that this theory is no longer cognizable under *Bivens*. (Def. Mem. at 9). The Court finds that even if this theory is still cognizable under *Bivens*, here it is deficient in much the same way as Plaintiff's personal involvement theory. In order for a defendant to be liable, a plaintiff must show: that a constitutional violation occurred, in the defendant's presence, that the defendant knew or should have known about, that he had an opportunity to intervene, and that he did not take steps to intervene. *See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). In other words, before a defendant can be liable for willful inaction, he must still be objectively aware of a constitutional wrong.

Here again, the majority of Plaintiff's constitutional claims stem from conclusory and unsupported allegations about things that she claims occurred during the initial interview, which Defendant did not conduct, observe, or otherwise participate in. (O'Connell Decl. ¶ 6.) Most of Plaintiff's complaints do not even facially amount to constitutional violations. The only misconduct that Plaintiff's testimony loosely supports is the fact that, at one point, an interviewer raised his voice "just briefly." (Vargas Decl., Ex. A, Pl. Dep. Tr. 56:5.) This is not conduct that would put Defendant on notice about the need to intervene to prevent a constitutional violation. Because none of the conduct Plaintiff complained about amounts to anything akin to a Fourth nor Eight Amendment violation, the Court finds that there were no acts for which Defendant ought to have intervened during the June 11, 2014 interview.

## 2. Supervisory Liability

Plaintiff's argument under supervisory liability is similarly deficient. To begin, all the case law that Plaintiff cites pertains to bona fide supervisors who negligently, if not willfully, supervised the conduct of their *subordinates*. (*See* Pl. Mem. Opp. at 5-6.) Here, Plaintiff has not established that Defendant even was the supervisor of the individuals who interviewed her.

Indeed, in her own Declaration, Plaintiff states:

> Precise specifics of O'Connell's investigation including his placement in the Postal Inspection Service's organizational structure, who O'Connell reports to, who reports to O'Connell, the method of assigning cases in the Postal Inspection Service, the reliability of certain information that he received, and whether O'Connell ignored exculpatory information are not available because O'Connell was not deposed.

Pl. Decl. Opp. ¶ 7.) Again, it is difficult for the Court to sympathize with Plaintiff's lack of concrete evidence about O'Connell's job position when she had ample opportunities during discovery to try and attain such information. (*See* Memorandum and Order Dated 10/10/2018.)

In the meantime, Defendant has testified:

> To be clear, I am not a supervisor, nor was I supervisor in June 2014. I did not make assignments, and I did not give orders to other Postal Inspectors. On June 11, 2014, I did not instruct or direct anyone to seize, detain, or otherwise hold Dayna Johnson involuntarily, nor was I in a position to do so.

.
(Supplemental Declaration of Dennis O'Connell, ("O'Connell Supp. Decl.") at 4, ECF No. 60.)

Unfortunately for Plaintiff, absent any admissible and credible evidence to the contrary, Defendant's testimony remains undisputed and defeats any argument for supervisory liability.

## 3. Qualified Immunity

Lastly, Defendant argues that, even if Plaintiff's constitutional claims were to survive summary judgment, he is entitled to qualified immunity because any potential false arrest or imprisonment of Plaintiff was supported by sufficient probable cause. (Def. Mem. at 10-15.)

"Qualified immunity shields government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995). Government actors performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982)). The immunity protects a government actor if it was "objectively reasonable" for him to believe that his actions were lawful at the time of the challenged act." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 107 S. Ct. 3034, 3039 97 L. Ed. 2d 523, 640 (1987). "The objective reasonableness test is met—and the defendant is entitled to immunity—if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 340-41 106 S. Ct. 1092, 1096 89 L. Ed. 2d 271 (1986)).

In addition, as Defendant correctly notes, an officer is entitled to qualified immunity in a suit for false arrest if he can establish that he had "arguable probable" cause to arrest the plaintiff. *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015). Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)). "In deciding whether an officer's conduct was objectively reasonable ..., we look to the information possessed by the officer at the time of the arrest, but we do not consider the subjective intent, motives, or beliefs of the officer." *Id.* (quoting *Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir.2010)).

This Court has already found that there was sufficient probable cause to justify initially questioning plaintiff and subsequently arresting Plaintiff, (*see supra* Part III.A.1) ("Even putting Plaintiff's consciousness of confinement aside, the evidence reflects that there was probable cause for the confinement and questioning"); (*see also supra* III.A.2.i) ("Even though Plaintiff claims that she advised against committing the robbery, the connection she had to the suspects and timing of her resignation are sufficient probable cause.").

Accordingly, the Court necessarily finds that Defendant is entitled to qualified immunity.

### D.  Defendant Anna (Jane Doe)

Plaintiff Anna (Jane Doe) appears on the Docket but has never been served. Plaintiff's original and amended complaint did not provide sufficient information for the Court to identify and/or serve Anna (Jane Doe). (*See* Order of Service Dated July 13, 2015, ECF No. 7) ("The amended complaint does not appear to provide adequate information to serve Postal Inspector 'Anna (Jane Doe).' As this matter proceeds, the Court will consider issuing an order directing the government to assist Plaintiff in determining the identity of the Doe defendant….")

It has been more than three years since the Court issued that Order of Service, and Plaintiff has never provided the Court with more information to ascertain the identity of Anna (Jane Doe) or otherwise indicate that she is still interested in prosecuting that defendant. Consequently, Defendant Anna (Jane Doe) has never been identified, served, or appeared in the case.

In any event, even if Defendant Anna (Jane Doe) had been served and had appeared in the case, Plaintiff's claims against her would be decided in the same way, and for largely the same reasons, as the claims asserted against Defendant. Accordingly, all claims against her are dismissed.

**CONCLUSION**

For the aforementioned reasons, Defendant's Motion for Summary Judgment is GRANTED in its entirety. As noted in *supra* Part D, Defendant Anna (Jane Doe) has never been served and never appeared in the case; however, Plaintiff's claims against her would be decided in the same way, and for the same reasons, as the claims asserted against Defendant. Accordingly, all claims against Defendant Anna (Jane Doe) are dismissed. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 55, terminate Defendant Anna (Jane Doe), terminate the case, and to enter judgment in favor of Defendant. The Clerk of the Court is additionally directed to mail a copy of this order to Plaintiff at her address listed on ECF.

SO ORDERED.

Dated:   October 17, 2018
         White Plains, New York

_____
NELSON S. ROMÁN
United States District Judge